UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.: 16-20627-GOODMAN
[CONSENT CASE]

IDMWORKS, LLC,

      Plaintiff,

v.

GAURAV POPHALY,

      Defendant.

_____/

## ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION

Plaintiff IDMWORKS, LLC filed a verified motion for temporary injunctive relief. [ECF No. 5]. Defendant Gaurav Pophaly opposes the motion. [ECF No. 19]. The Court held an evidentiary hearing on the Motion. [ECF No. 34]. For the reasons outlined below, the Undersigned **denies** Plaintiff's Motion for Injunctive Relief.

I.     **Background**

    a.     **General Factual Background**

As Plaintiff describes itself, it is in the information-technology business. More specifically, Plaintiff constructs and improves corporate identity-and-access management ("IAM") software solutions -- *i.e.*, a form of corporate-network security -- for commercial enterprises. [ECF Nos. 1, p. 2 (Verified Complaint for Injunctive Relief and Damages); 38, p. 39 (May 2, 2016 Hearing Transcript]. In layman's terms, Plaintiff's

"services are meant to make sure that the right people get the right access to the right things at the right times." [ECF No. 38, p. 39].

### b.  Plaintiff's Relationship with Defendant

On July 20, 2012, Plaintiff hired Defendant as an "Identity and Access Management Engineer." [ECF No. 38, p. 40-41; Pl. Ex.[1] 1 (specifically, Exhibit A to Employment Agreement)]. At the time of his hiring, Defendant did not have any specific prior experience with IAM services. [ECF Nos. 38, p. 42; 33-1 (Stanciu April 28, 2016 Deposition Transcript), p. 29]. Indeed, Defendant's resume at the time of his hiring makes no reference to "Identify and Access Management." [ECF No. 38, p. 99; Pl. Ex. 9 (Defendant's 2012 Resume)]. Nor did Defendant then possess the skill, knowledge, and ability required to provide the type of IAM services provided by Plaintiff. [ECF Nos. 38, p. 42; 33-1, p. 29].

Defendant entered into a restrictive covenant whereby he promised not to compete with Plaintiff. More specifically, Defendant executed a Confidentiality, Non-Competition, and Non-Solicitation Agreement (the "Agreement"), which provides, in pertinent part, that the Defendant "agrees that [he] shall not in any capacity, directly or indirectly . . . (a) provide services of any kind to any company that [he] has previously provided consulting services to on behalf of IDMWORKS." [Pl. Ex. 2, ¶ 4(a)].

---

[1]   The Undersigned shall refer to exhibits submitted by Plaintiff during the evidentiary hearing as "Pl. Ex." and refer to exhibits submitted by Defendant as "Def. Ex."

The Parties disagree on the amount and nature of the training which Plaintiff provided to Defendant, but the Court makes the following findings concerning the training:

Defendant participated in a two or three week formal training with his direct supervisor and friend, Alex Stanciu, at the beginning of his employment with Plaintiff. [ECF No. 38, p. 43]. This informal training took place at Mr. Stanciu's personal residence and "often went later than normal business hours." [ECF No. 33-1; pp. 10-11]. The only **formal** training Defendant actually received while employed with Plaintiff was a conference for Quest APS. [ECF No. 38, p. 126]. Although Plaintiff seems to have covered some of Defendant's travel expenses, it did not actually pay for Defendant to attend the Quest APS conference. [ECF No. 38, p. 82]. Moreover, Defendant never used Quest APS while employed by Plaintiff or in his position at Ernst & Young ("EY"). [ECF No. 38, pp. 80, 126].

Each of the remaining instances of purported training alleged by Plaintiff was unsubstantiated, as outlined below.

1.    Plaintiff's Oracle Subscription: Plaintiff alleged a substantial monetary investment into Defendant's training in connection with Plaintiff's subscription to Oracle. [ECF No. 20-1, ¶¶ 12-15]. However, Plaintiff's CEO Todd Rossin retreated from the dollar amounts he described in his declaration. [ECF Nos. 20-1; 38, pp. 83-85]. Plaintiff paid a lump sum to Oracle for Plaintiff and all of its employees to have *access* to

the Oracle platform and materials. [ECF No. 38, pp. 83-85]. It was never established that Defendant actually **used** study materials beyond those he purchased himself. [ECF No. 38, pp. 83, 127].

       2.     <u>Oracle Training in Philadelphia</u>: Plaintiff represented that Defendant participated in a ten-day Oracle training session in Philadelphia. [ECF No. 20-1, ¶ 12(d)]. However, Defendant was providing services to Plaintiff's client in Chicago at the relevant time. [ECF No. 38, p. 125]. Defendant's supervisor confirmed that Defendant did not participate in this training. [ECF No. 33, p. 17].

       3.     <u>In-House Training Program</u>: Plaintiff represented that Defendant participated in an in-house training program entitled "Strategic Investment in Employees." [ECF No. 20-1, ¶ 15]. This was not in fact the name of the event, and it was actually a summit for employees. [Pl. Ex. 4]. The document describing the summit and Defendant's testimony suggest that the summit was not a training session, but, rather, a forum for employees to communicate between themselves about clients and technologies they are using. [ECF No. 38, p. 128; Pl. Ex. 4]. As Defendant suggested, it appears to have been a team-building exercise. [ECF No. 38, p. 128]. Plaintiff's CEO contradicted his own testimony regarding the extent to which the summit included Oracle training. [ECF No. 38, p. 50]. Defendant's supervisor confirmed that Plaintiff never provided Defendant with formal in-house training of the kind described by Plaintiff's CEO in his declaration. [ECF No. 33, p. 15].

4.    <u>Additional One-on-One Training</u>: Plaintiff represented that Defendant received weeks of one-on-one training in addition to the initial training with Mr. Stanciu. [ECF No. 20-1, ¶ 12(h)]. Plaintiff provided no further information regarding the training and both Defendant and his direct supervisor deny that Defendant received additional one-on-one training. [ECF Nos. 33, p. 17; 38, pp. 17-19].

The Undersigned also deems significant the fact that the Oracle "training" was not actually training provided by Plaintiff. Instead, it was *access* to **Oracle's** training, and Plaintiff's CEO did not know for certain whether Defendant actually took advantage of the access provided. Moreover, the Undersigned also finds it highly relevant that the access provided by Oracle was made available to all of its partners in the network -- which means it was likely made available to more than 50 other partners. Therefore, this aspect of the so-called specialized training is actually *Oracle* training which Plaintiff gave Defendant access to as part of his employment.

In light of the many inconsistencies in Plaintiff's position and its failure to offer testimony from a witness knowledgeable as to Defendant's training, this Court concludes that Defendant's only actually specialized trainings were the initial two- or three-week informal training with Mr. Stanciu at his residence and the Quest APS conference. The remainder of Defendant's training which Plaintiff sufficiently established was self-administered or on the job. [ECF Nos. 33 pp. 16, 35-36; 38, p. 127].

c.    **Plaintiff's Business Relationship with Ernst & Young**

In August 2011, Plaintiff formed a business relationship with EY. [ECF No. 38, p. 62]. Plaintiff provided EY with IAM services such as IAM architecture, IAM implementation, IAM development, and IAM support services (primarily concerning Oracle "identity manager" and related products). [*Id.*, p. 62]. To the extent that Plaintiff's employees needed to perform IAM services onsite for EY, Plaintiff's employees traveled to EY's offices to do so. [*Id.*, p. 63]. Plaintiff's employees used equipment owned by EY. [*Id.*, p. 64]. Plaintiff's employees used e-mail addresses issued by EY. [*Id.*]. Plaintiff expected payment from EY. [*Id.*, p. 62]. EY was in fact responsible for payment to Plaintiff for the provision of those IAM services. [*Id.*, p. 63]. EY was the beneficiary of the IAM services provided by Plaintiff. [*Id.*, p. 63]. And Plaintiff derived approximately $750,000 in revenues from EY. [*Id.*, p. 63].

From a formalistic perspective, Plaintiff provided certain IAM services through Clearpath Workforce Management ("Clearpath"). [ECF No. 31, p. 16]. As an employee of Plaintiff, Defendant was assigned by Clearpath to provide services to EY.

d.    **EY's Hiring of Defendant, and Termination of its Relationship with Plaintiff**

As noted above, Plaintiff did not actually have a contract with EY and did not receive payment directly from EY. [ECF No. 38, p. 17]. Situated between Plaintiff and EY during Defendant's employment with Plaintiff was a company called Clearpath. [ECF No. 38, p. 75]. Plaintiff attempted to label Clearpath as a mere payroll company in

several filings with the Court, but Rossin backed down from that assertion, conceding that Clearpath also provides vendor services. [*Compare* ECF No. 28-1 at ¶ 15, *with* ECF No. 38, pp. 64; 75]. Specifically, Rossin agreed that EY "engages contract staffing services through Clearpak [sic]." [ECF No. 38, p. 75].

Plaintiff also conceded that there was no exclusivity as to the provision of information technology, or even IAM, services. [ECF No. 38, p. 17]. Maryann Falduto, EY's director of vendor services, and Defendant both confirmed that EY has many information technology vendors. [ECF No. 31-1, pp. 17-18; ECF No. 68, pp. 131-33]. The company hired to replace Plaintiff has provided services to EY for several years and provides IAM services almost exclusively. [ECF No. 38, p. 131].

Defendant had been working on an IAM project at EY when EY extended a job offer to him in November 2015. [ECF No. 38, p. 130]. **Defendant did not accept** the offer, and he **communicated the offer to Plaintiff.** [ECF No. 38, p. 130]. EY had a history of making employment offers to Plaintiff's employees. [ECF No. 33-1, p. 13]. **Plaintiff confronted EY about its offer** to Defendant, and at that point, *EY* itself made the decision to not continue using Plaintiff's employees after the December 31, 2015 expiration of EY's contract with Clearpath. [ECF No. 38, pp. 130-32]. EY replaced Defendant and Plaintiff's other employees with a consultant by the name of Logu Christian from a company called Aptec. [*Id.*]. Defendant and Plaintiff's other employees working at EY transferred files prepared for EY to the new Aptec consultant. [*Id.*].

Plaintiff's arrangement with EY expired at the end of December, and at that point EY made a second employment offer to Defendant. [ECF Nos. 19-1, ¶ 34; 38, p. 131]. Defendant accepted the offer in early January. [ECF No. 19, ¶ 45].

### e. Defendant's Position at EY

Defendant is now Assistant Director of Identity Management Engineering at EY. [ECF No. 19-1, ¶ 47]. In Defendant's management position, he is responsible for making decisions as to EY's IAM programs and designing IAM solutions. [ECF No. 19-1, ¶¶ 47-50].

## II.   <u>Governing Legal Standard</u>

Plaintiff's motion is one seeking "temporary injunctive relief." There is no such specific relief listed in Federal Rule of Civil Procedure 65. Instead, Rule 65(a) provides for a preliminary injunction and Rule 65(b) provides for a temporary restraining order, which may not exceed 14 days (but the Court may extend it for another 14 days for good cause or for a longer time if the adverse party consents). At the hearing, Plaintiff clarified its position and noted that its motion seeks a preliminary injunction. [ECF No. 38, p. 27].

The parties agree on the legal standard -- *i.e.*, Plaintiff must show: "(1) there is a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury exists if an injunction is not granted; (3) the threatened injury to the plaintiff outweighs any harm that an injunction may cause the defendants; and (4) issuing the

injunction will not harm the public interest." *Winmark Corp. v. Brenoby Sports, Inc.*, 32 F. Supp. 3d 1206, 1218 (S.D. Fla. 2014).

A preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly establishes the "burden of persuasion" as to the four factors. *Siegel v. LePore,* 234 F.3d 1163, 1176 (11th Cir. 2000). Granting a preliminary injunction "is the exception rather than the rule." *Id.* (quoting *Texas v. Seatrain Int'l, S.A.,* 518 F.2d 175, 179 (5th Cir. 1975).

Here, the Court finds that Plaintiff has failed to satisfactorily demonstrate the existence of the first factor: substantial likelihood of success on the merits. Therefore, it is not necessary to evaluate the other three factors. Plaintiff *might* prevail on the merits at trial, but, as outlined below, it is a stretch to now conclude there is a *likelihood* of success. Plaintiff cannot obtain a preliminary injunction by merely proving the *possibility* of success, which is all it has established.

### III.   Analysis

#### Substantial Likelihood of Success on the Merits

In order to prevail in the instant action, Plaintiff will have to demonstrate two points. First, Plaintiff must demonstrate that the restrictive covenants at issue are reasonably necessary to protect a legitimate business interest. Second, Plaintiff must demonstrate that Defendant breached an enforceable restrictive covenant. Plaintiff has

failed to carry its burden with respect to the first and therefore does not have a substantial likelihood of success on the merits.

### i.   The Restrictive Covenants are Unenforceable Under Fla. Stat. § 542.355

"Florida statutory law (as a matter of public policy) does not allow a party to enforce a restrictive covenant unless it proves that enforcement is **necessary to protect its legitimate business interests.**" *Evans v. Generic Sol. Eng'g, LLC*, 178 So. 3d 114, 116 (Fla. 5th DCA 2015) (emphasis added) (reversing order providing injunctive relief because plaintiff did not have a substantial enough business relationship with a former customer that would permit enforcement of a restrictive covenant). A legitimate business interest must represent an investment by the employer and must enable unfair competition if misappropriated. John A. Grant, Jr. & Thomas Steele, *Restrictive Covenants: Florida Returns to the Original "Unfair Competition" Approach for the 21st Century*, 70 (Nov.) Fla. B.J. 53, 55 (1996).

In the instant case, the only legitimate business interests alleged by Plaintiff are (1) its interest in specialized or extraordinary training, and (2) its substantial customer relationship with EY.[2] Further, a restrictive covenant can only be enforced to the extent that it is necessary to protect a legitimate business interest. Fla. Stat. § 542.335(1)(c). Plaintiff does not have a substantial likelihood of success on the merits because it has neither sufficiently proven the existence of a legitimate business interest or that

---

[2]     Plaintiff withdrew all arguments based on confidential information. [ECF Nos. 20, n.1; 38, pp. 35, 133].

enforcement of the restrictive covenant is reasonably necessary. Fla. Stat. § 542.335(b) - (c). In short, Defendant is not employed by EY as a result of the type of harm the statute was designed to protect against -- an unfair competitive advantage.

ii.    **Plaintiff Did Not Have a Substantial Customer Relationship With EY**

Florida law protects "**[s]ubstantial** relationships with specific prospective or existing customers, patients, or clients." Fla. Stat. § 542.335 (emphasis added).

Plaintiff here cannot read the word "substantial" out of the statute and gain the benefit of an injunction based upon *a* relationship with EY that was non-exclusive, vague and apparently terminated by EY itself because it was offended or upset by Plaintiff's decision to stridently confront it about Defendant's job offer. *See generally Evans,* 178 So. 3d at 117 (holding that plaintiff's lack of any exclusive contract with customer, coupled with its lack of a reasonable expectation that plaintiff would continue to provide services to the customer after its non-exclusive contract expired, constituted basis to overturn the trial court's finding of a substantial relationship and to reverse the injunctive relief); *Anich Indus., Inc. v. Raney*, 751 So. 2d 767 (Fla. 5th DCA 2000) (affirming denial of employer's request for preliminary injunction against former employee and her new employer for violating the terms of a non-compete agreement because it did not demonstrate the existence of a legitimate business interest).

Plaintiff has not sufficiently demonstrated a substantial customer relationship with EY. Although the relevant statute does not define the criteria for substantial

relationships, an analysis of Florida case law reveals that a substantial relationship is more likely to exist where there is active, on-going business being conducted; exclusivity; a customer who cannot be easily identified by other competitors in the industry; and an expectation of continued business. *See, e.g., Evans,* 178 So. 3d at 116-18; *Envtl. Servs., Inc. v. Carter,* 9 So. 3d 1258, 1266 (Fla. 5th DCA 2009); *Shields v. Paving Stone Co.,* 796 So. 2d 1267, 1268-69 (Fla. 5th DCA 2001); *Anich Indus., Inc.,* 751 So. 2d at 770-71.

In the instant case, Plaintiff has not adequately established any of the factors that tend to support the existence of a substantial relationship with EY.

First, Plaintiff has not demonstrated that it is in the midst of an active relationship with EY. In fact, it did not have an actual contract directly with EY. Instead, Plaintiff contracted out Defendant to provide services through Clearpath. Clearpath then subcontracted Defendant to EY. This does not sufficiently establish the existence of a substantial relationship. *See, e.g., Concrete Surface Innovations, Inc. v. McCarty,* Case No. 6:10-cv-568, 2010 WL 1930971, *8 (M.D. Fla. May 13, 2010) (noting that the existence of multiple layers of contractors and sub-contractors between the vendor and the end customer militates against the existence of substantial relationships).

Second, Plaintiff did not have anything approaching an exclusive relationship with EY. Plaintiff's CEO testified that he was "sure" that EY utilized other companies to provide IAM services. [ECF No. 38, p. 17]. Defendant confirmed this at the hearing and an EY employee confirmed as much during her deposition. [ECF Nos. 31-1, p. 17-18; 38,

p. 132-133]. *See Evans*, 178 So. 3d at 117 (finding no substantial relationship where company did business with multiple vendors of the same services).

Third, a large company like EY can easily be identified by competing companies and targeted as a prospective client. *See Shields*, 796 So. 2d at 1268 (denying injunction where employer did not have exclusive relationships with any of its customers and where customers were "readily identifiable" by publicly available means such as trade journals or the yellow pages).

Fourth, Plaintiff had no expectation of continued, albeit indirect, business from EY beyond December of 2015. As Plaintiff's CEO testified, EY terminated its relationship with Plaintiff by not extending the arrangement beyond the December 31, 2015 expiration date. [ECF No. 38, p. 66]. In November 2015, Plaintiff threatened to pull its employees off the EY project. In response to this threat, EY began transitioning the work to another company and terminated the Clearpath/IDMWORKS arrangement at the end of December 2015.

Therefore, it appears that Plaintiff's threats to EY was the cause of the end of whatever relationship that may have existed before Defendant ultimately accepted direct employment with EY. *See, e.g.*, *TrueBlue, Inc. v. Dyn*, No. 8:09-cv-1894, 2010 WL 3565756, *4 (M.D. Fla. Sept. 9, 2010) (denying motion for summary judgment for failure to establish legitimate business interest in substantial relationships with customers given evidence that Plaintiff did not value its client relationships).

By the time Defendant accepted employment with EY, Plaintiff had no employees performing services for EY (whether through Clearpath or directly). Even if EY could be considered Plaintiff's customer (as opposed to *Clearpath's* customer), by the time Defendant accepted employment with EY, it was by then a **former** customer. A company cannot successfully claim a protectable business interest in a relationship with a former customer.[3] *See Envtl. Servs., Inc. v. Carter*, 9 So. 3d at 1265 ("[P]rotection of former customers generally does not qualify as a legitimate business interest where no identifiable agreement exists with such customers establishing that they would return with future work.").

Plaintiff argued, but failed to prove, that it was Defendant's behavior that caused EY to end the relationship. The Court finds Defendant's version of why EY terminated the relationship credible. The Court's position is bolstered by the fact that EY hired a different IAM firm to replace Defendant and Plaintiff's other employees. The weight of the evidence does not support Plaintiff's assertion that EY ended its relationship with Plaintiff because it hired Defendant to perform Plaintiff's job directly. Under these facts,

---

[3]     Plaintiff seems to rely exclusively on the argument that EY was a current customer in its Reply. [ECF No. 20, pp. 2-4]. However, it was Plaintiff's burden to establish that Defendant somehow competed while Plaintiff's employees were still providing services to EY. Instead, the weight of the evidence indicates that EY made plans to replace Plaintiff and implemented a transition plan earlier in December. For these reasons, the Court finds that Plaintiff failed to establish that EY was a current customer at the time Defendant accepted EY's second offer of employment and left Plaintiff's employ.

enforcement of the restrictive covenants does not protect a substantial customer relationship.

### iii.     Plaintiff Did Not Provide Extraordinary or Specialized Training

Plaintiff alleged that it has a legitimate business interest in the training it provided Defendant. Training constitutes a legitimate business interest protectable by an injunction only when the training rises to the level of being specialized or extraordinary.  Fla. Stat. § 542.335(1)(b)(5). This means that training must go beyond that typically offered in any given industry. *Autonation Inc. v. O'Brien*, 347 F. Supp. 2d 1299, 1306 (S.D. Fla. 2004) (requiring that training exceed what is common or typical in the industry before it can become a protectable interest); *Dyer v. Pioneer Concepts Inc.*, 667 So. 2d 961 (Fla. 2d DCA 1996) (quoting *Hapney v. Cent. Garage, Inc.*, 579 So. 2d 127, 132 (Fla. 2d DCA 1991) ("Training is classified as extraordinary when it exceeds 'what is usual, regular, common, or customary in the industry in which the employee is employed.'").

In light of the testimony provided by Plaintiff's CEO at the injunction hearing (and as outlined in the factual summary earlier in this Order), this Court finds that Plaintiff's interest in Defendant's training is not subject to injunctive relief because Plaintiff did not establish that the training was specialized.

First, any actual training Defendant received seems typical of most industries. Plaintiff adduced no evidence that the actual training provided to Defendant went

beyond industry norms. Instead, the only testimony about training within the industry came from the Defendant, who testified that the training he received was not different from training he would expect to receive at other companies in the industry. [ECF No. 38, pp. 126-27]. Without Plaintiff providing any evidence or testimony that the training it provided to Defendant exceeded what is typical in the industry, this Court cannot say that the training constitutes a protectable interest entitled to injunctive relief. *See Autonation Inc.*, 347 F. Supp. 2d at 1306.

Second, providing Defendant **access** to a database of Oracle training materials does not constitute extraordinary or specialized training for several reasons. Evidence presented at the hearing established that many other companies have access to the same database of Oracle training materials and provide the same access to their employees. [ECF No. 38, pp. 90, 127, 137]. Thus, this so-called training (or access to training) is not a protectable interest of *Plaintiff's. See Autonation*, 347 F. Supp. 3d at 1306 (finding no extraordinary training where there was no specialized training that went beyond what is normal or typical in the industry).

Third, the evidence revealed that use of the Oracle training materials was optional. Optional training does not constitute a legitimate business interest sufficient to justify injunctive relief. *See Austin v. Mid State Fire Equip. of Cent. Florida, Inc.*, 727 So. 2d 1097, 1098 (Fla. 5th DCA 1999) (finding that optional training did not rise to the level of specialized or extraordinary training and did not constitute a legitimate business

16

interest protectable by injunction); *see also Autonation Inc.*, 347 F. Supp. 2d at 1306 (finding no legitimate business interest in protecting training where employee "was not required to attend the various training seminars and only 'popped in and out' of the meetings.").

Therefore, Plaintiff does not have a legitimate business interest in Defendant's training sufficient to warrant injunctive relief.

**IV.    <u>Conclusion</u>**

Plaintiff has not established a likelihood of success on the merits and the Undersigned is therefore compelled to deny its request for a preliminary injunction. *See Anich*, 751 So.2d 767, 770 (because employer failed to demonstrate the existence of a legitimate business interest, it therefore failed to demonstrate a likelihood of success on the merits of its claim for violation of a non-compete agreement); *Dawson v. Ameritox, Ltd.*, 571 F. App'x 875, 879-80 (11th Cir. 2014) (agreeing with district court's order terminating a temporary restraining order and denying the request for a preliminary injunction because the party failed to demonstrate a substantial likelihood of success on the merits and stating that, because the party failed to meet likelihood of success, the district court did not need to address the other requirements for obtaining injunctive relief); *Oce North America, Inc. v. Caputo*, 416 F. Supp. 2d 1321, 1325 (S.D. Fla. 2006) ("the Court finds that Defendant has posited valid defenses to the contract which Plaintiff has not established a substantial likelihood of success in overcoming."); *Pirtek, USA LLC v.*

*Whitehead*, Case No. 05-0242-CG-C, 2006 WL 2038651, *4 (S.D. Ala. Apr. 27, 2006) ("plaintiff has failed to establish that it has a legitimate business interest in protecting against competition[;] . . . therefore, the court concludes that plaintiff has not demonstrated a substantial likelihood of success on the merits, as defined by [Florida Statute §] 542.335.").

To be sure, Plaintiff "may very well prevail in the present action in the end," but its failure to establish **likelihood** of success necessarily means it has failed to carry its burden of demonstrating that the extreme remedy of a preliminary injunction is appropriate here. *Oce*, 416 F. Supp. 2d at 1329.

**DONE AND ORDERED** in Chambers at Miami, Florida, June 23, 2016.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

<u>**Copies furnished to**</u>:
All Counsel of Record